## IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

THE AMERICAN BOTTLING
COMPANY,

          Plaintiff,

          v.

MIRE REPOLE, BA SPORTS
NUTRITION, LLC and THE
COCA-COLA COMPANY

          Defendants.

)
)
)
)
) C.A. No. N19C-03-048 AML CCLD
)
)
)
)
)
)
)
)
)

**Submitted: September 21, 2020**
**Decided:December 30, 2020**

## MEMORANDUM OPINION

**Upon Defendants' Partial Motion to Dismiss the Second Amended Complaint:
GRANTED in part and DENIED in part.**

Garrett B. Moritz, Esquire, Anne M. Steadman, Esquire, of ROSS ARONSTAM &
MORITZ LLP, Wilmington, Delaware, Robert C. Walters, Esquire, Russell H.
Falconer, Esquire, and Megan Z. Hulce, Esquire, of GIBSON DUNN &
CRUTCHER LLP, Attorneys for Plaintiff The American Bottling Company.

A. Thompson Bayliss, Esquire, Daniel J. McBride, Esquire, of ABRAMS &
BAYLISS LLP, Wilmington, Delaware, David H. Bernstein, Esquire, Jyotin
Hamid, Esquire, Jared I. Kagan, Esquire, and Matthew J. Petrozziello, Esquire, of
DEBEVOISE & PLIMPTON LLP, Attorneys for Defendants Mike Repole and BA
Sports Nutrition, LLC

**LEGROW, J.**

In the third iteration of its complaint, Plaintiff maintains claims for breach of contract and promissory estoppel against a beverage company, along with a claim for tortious interference with contract against the beverage company's chairman and CEO. Plaintiff and the beverage company were parties to an exclusive distribution agreement that the beverage company allegedly breached by terminating the agreement and granting exclusive distribution rights and an ownership stake to another company. The chairman allegedly orchestrated these events to create liquidity for himself and his management team at the expense of the beverage company and its stockholders.

The beverage company and its chairman have moved to dismiss the promissory estoppel and tortious interference claims against them. As to the tortious interference claim, the pending motion requires the Court to consider whether Plaintiff's allegation that the chairman prioritized up-front cash and therefore entered into an unfavorable agreement with his company's competitor sufficiently pleads a tortious interference claim. As set forth below, that claim fails because Plaintiff has not pleaded sufficient facts to overcome the presumption that the chairman acted in his company's best interests. The operative complaint does nothing more than challenge a quintessential business decision. As to the promissory estoppel claim, however, the Court previously held that this claim adequately was pleaded in an earlier version of the complaint. The minor changes

to the facts alleged in the operative complaint are not material, and this Court's previous ruling therefore remains law of the case.

## BACKGROUND[1]

This breach of contract action arises from a distribution agreement (the "Distribution Agreement") between The American Bottling Company ("ABC") and BA and Sports Nutrition, LLC ("Bodyarmor"). Following the merger between ABC's parent company and Keurig Green Mountain, Inc., Bodyarmor terminated the Distribution Agreement. Bodyarmor then granted Coca-Cola ("Coke") the exclusive right to distribute Bodyarmor's products in exchange for Coke purchasing a stake in Bodyarmor. ABC filed claims for breach of contract and promissory estoppel against Bodyarmor, a claim for tortious interference against Bodyarmor's Chairman and CEO, Mike Repole, ("Repole," and together with "Bodyarmor," "Moving Defendants"), and a claim for tortious interference against Coke.

### A. The Distribution Agreement

ABC is a leading U.S. beverage distributor. In 2015, while trying to gain a foothold in the sports drink market, Bodyarmor, led by its co-founder, Repole, entered into the Distribution Agreement with ABC that granted ABC the exclusive

---

[1] Unless otherwise noted, the facts recited herein are drawn from the allegations in Plaintiffs' SAC, together with its attached exhibits, and are presumed true for the purposes of Defendants' motion to dismiss.

right to distribute Bodyarmor's products in most of the U.S. for ten years.[2] Over the next three and a half years, ABC used its distribution network and expertise to help build Bodyarmor into one of the fastest growing sports drink brands in America.[3]

## B. The KDP Transaction

In January 2018, ABC's upstream parent company, Dr. Pepper Snapple Group, Inc. ("DPSG")—a company three levels removed from ABC in the corporate structure—announced its intent to acquire Keurig Green Mountain, Inc. from its parent JAB Holding Company (the "Merger") and rename itself Keurig Dr. Pepper Inc. ("KDP").[4] According to ABC, the Merger had no adverse effects on Bodyarmor; on the contrary, the transaction gave Bodyarmor an opportunity to enhance the quality and scope of its distribution network.[5]

The day the transaction was announced, Repole told a Dr. Pepper executive that he was "so happy for you and the family" and that "[t]his is a great deal for you guys and the future of Dr. Pepper!"[6] Shortly thereafter, Repole had one-on-one meetings with JAB and Keurig personnel about the transaction and Bodyarmor's future with ABC.[7] After one such meeting, Repole seemed thrilled about the opportunities for Bodyarmor that the transaction presented, writing in a text

---

[2] SAC ¶¶ 32-33.
[3] *Id.* ¶¶ 43, 45.
[4] *Id.* ¶¶ 47-48.
[5] *Id.* ¶ 49.
[6] *Id.* ¶ 50.
[7] *Id.* ¶¶ 51, 53.

3

message, "We were happy to share the bodyarmor story with you. Congrats on the AMAZING deal. This has unlimited potential!!!"[8] A few weeks later, Repole stated to Bodyarmor: "The team and I are excited about a potential partnership with JAB/kdp. We are focused on continuing to build bodyarmor to be the number 1 sports drink and being a huge asset to kdp in many areas."[9] And, Repole repeatedly pursued meetings with JAB about a potential partnership, including an acquisition of Bodyarmor.[10] Through these messages, conversations, and actions—all of which occurred before the Merger closed in July 2018—Repole conveyed that he and Bodyarmor "approved of ABC's distribution and of the KDP Transaction."[11]

### C. Bodyarmor's termination of the Distribution Agreement

In August 2018, after the Merger closed, Bodyarmor terminated its distribution agreement with ABC, alleging ABC had breached Section 10.2 of the Distribution Agreement by failing to request and obtain Bodyarmor's approval of the KDP transaction.[12] Section 10.2 provides that ABC may not transfer the Distribution Agreement (or its duties under it) without Bodyarmor's approval and that Bodyarmor may not withhold its approval unreasonably.[13] According to ABC, the Merger between DPSG and Keurig Green Mountain did not amount to a transfer

---

[8] *Id.* ¶ 51.
[9] *Id.* ¶ 52.
[10] *Id.* ¶ 53.
[11] *Id.* ¶ 98; *see also id.* ¶¶ 8, 10, 12, 46, 96, 101.
[12] *Id.* ¶ 101.
[13] *Id.* ¶ 42.

4

of the Distribution Agreement and, even if it did, Bodyarmor had no reasonable basis to withhold approval of the transfer.

ABC alleges the real reason Bodyarmor wrongfully terminated the Distribution Agreement was so Repole could cause Bodyarmor to convey ABC's exclusive distribution rights to Coke's affiliates.[14] In exchange for the those distribution rights, Coke purchased a fifteen percent stake in Bodyarmor for $300 million—an up-front cash payment that purported to value Bodyarmor at $2 billion (the "Coke Deal").[15] The proceeds of Coke's $300 million investment primarily funded a distribution to Repole and Bodyarmor's management.[16] ABC alleges Repole's primary reason for completing the Coke Deal was his personal interest in obtaining a substantial cash payment for himself and his management team.[17]

According to ABC, Repole pursued his personal interest in a prompt cash payment to the long-term detriment of Bodyarmor and its stakeholders.[18] In his pursuit of the Coke Deal, Repole agreed Bodyarmor would assume sole responsibility for the termination fee and any damages owed to ABC as a result of the Distribution Agreement's termination.[19] Repole also agreed to a two-tiered indemnity structure through which Bodyarmor agreed to indemnify Coke from any

---

[14] *Id.* ¶¶ 102, 104.
[15] *Id.* ¶ 76.
[16] *See* Pl.'s Resp., Ex. C, Coke-BA Unit Purchase Agreement § 1.2.1.
[17] SAC ¶¶ 17, 28(a)(i), 105, 125.
[18] *Id.* ¶¶ 17-19, 105-109, 126.
[19] *Id.* ¶ 74.

5

damages awarded in the litigation arising out of Bodyarmor's termination of the agreement.[20] He further agreed to a put/call mechanism giving Coke the right to buy Bodyarmor in November 2021 at a deeply discounted price.[21] In the e-mail that ABC quotes in the second amended complaint ("SAC"), Coke's CEO, James Quincey, agreed with an assessment made by Javier Drucker, Coke's Director of M&A, that this discounted put/call right would allow Coke to recoup the value of Bodyarmor's obligation to ABC at a later date.[22] According to ABC, Repole's desire for quick cash payment allegedly compromised his judgment in selecting Coke as a deal partner, despite unfavorable deal terms and Coke's conflict of interest as the owner of Powerade, one of Bodyarmor's biggest competitors. Repole allegedly rushed to complete the Coke Deal without regard for the substantial liability Bodyarmor incurred for breaching the Distribution Agreement.[23] Repole also received indemnification from Bodyarmor for any liability he personally might incur as a result of the Coke Deal.[24]

The SAC alleges three distinct ways in which Repole furthered his personal interest in a short-term cash payment at the expense of Bodyarmor's long-term interests: (1) the insistence on rushed deal timing in the summer of 2018, which

---

[20] *Id.* ¶¶ 16, 75(g), 88-89.
[21] *See* Ex. C, LLC Agreement, § 6.13.
[22] SAC ¶¶ 81, 82; see also Ex. A, COCA-COLA_0008502.
[23] *Id.* ¶¶ 108-09, 126.
[24] Pl.'s Resp., Ex. C, Repole Indemnification Agreement, § 1.

meant Bodyarmor would breach the Distribution Agreement and expose itself to substantial liability; (2) the use of an array of deal terms that sacrificed long-term value in the name of obtaining an upfront cash payment for management; and (3) the selection of Coke as a deal partner despite its conflict of interest as Powerade's owner.

### D. Procedural History

#### i. Original Complaint

ABC filed its Original Complaint on March 11, 2019 against Bodyarmor and Repole.[25] To support its tortious interference claim against Repole, ABC initially alleged that Repole, as "the co-founder, chairman, chief executive officer, and manager of BA Sports Nutrition, LLC," "sent a letter to ABC on behalf of Body[a]rmor" terminating the Distribution Agreement and entered a new distribution agreement with the Coca-Cola Company ("Coke") (with a related investment from Coke), which enabled Bodyarmor to reap "a premium valuation of about $2 billion."[26]

Bodyarmor and Repole moved to dismiss the Original Complaint, and on September 13, 2019, the Court dismissed without prejudice ABC's tortious interference claim against Repole. The Court held that the Original Complaint did

---

[25] Defs.' Mot., Ex. 1.
[26] Original Compl. ¶¶ 14-15, 20, 53.

not include "a well-pled tortious interference claim."[27] The Court permitted ABC to re-plead the tortious interference claim based on representations ABC's counsel made during oral argument that Repole did not obtain a sufficient valuation for Bodyarmor because he chose to pursue his own interests to Bodyarmor's detriment.[28] ABC amended its tortious interference claim in its First Amended Complaint ("FAC").[29] Defendants did not seek dismissal of the FAC's tortious interference claim.

With respect to the promissory estoppel claim against Bodyarmor, the Original Complaint cited three text messages Repole sent. The Original Complaint did not identify the recipient of those messages other than to say that one recipient was a "DPSG executive."[30] The SAC relies on the same three text messages.[31] Discovery has revealed that Repole sent two of the three text messages to Robert Gamgort, who at the time served as CEO of Keurig Green Mountain and did not hold any position with ABC or DPSG. Repole sent the third text message to Rodger Collins, who at the time served as ABC's President of Packaged Beverages. ABC included these text messages in the SAC and alleges they constitute unambiguous

---

[27] 9/13/2020 Hr'g Tr. at 90:22-91:7 (Defs.' Mot., Ex. 2).
[28] *Id.* at 92:15-16 ("I need more and I need the actual allegations [to be] in the complaint.").
[29] *Id.* at 92:10-12.
[30] Original Compl. ¶¶ 43-45.
[31] SAC ¶¶ 50-52.

promises that Bodyarmor would continue to operate under the Distribution Agreement:

- A January 29, 2018 message to Mr. Collins stating "so happy for you and the family" and "[t]his is a great deal for you guys and the future of Dr Pepper!"[32]

- A February 20, 2018 message to Mr. Gamgort stating, "We were happy to share the Bodyarmor story with you. Congrats on the AMAZING deal. This has unlimited potential!!!";[33] and

- A March 1, 2018 message to Mr. Gamgort stating, "The team and I are excited about a potential partnership with JAB/kdp. We are focused on continuing to build Bodyarmor to be the number 1 sports drink and being a huge asset to kdp in many areas."[34]

In September 2019, this Court dismissed ABC's tortious interference claim against Repole, holding that the allegations in ABC's Original Complaint were insufficient to state a claim.

On promissory estoppel, the Court held the Original Complaint adequately pleaded both an unambiguous promise and detrimental reliance, which were the two elements Bodyarmor contended were not sufficiently pleaded.[35] The Court noted that Bodyarmor was free to move for summary judgment after discovery closed, but stated that the Court could not resolve the promissory estoppel claim without a complete factual record.[36]

---

[32] Original Compl. ¶ 43.
[33] *Id.* ¶ 44.
[34] *Id.* ¶ 45.
[35] 9/13/2019 Hr'g Tr. at 89:22-90:4.
[36] *Id.* at 89:5-11.

### ii. FAC

ABC filed the FAC on September 30, 2019.[37] ABC introduced new factual allegations to support its tortious interference claim, alleging that Repole's decision as Bodyarmor's CEO to terminate the Distribution Agreement was driven by self-interest. ABC removed from one paragraph an allegation describing Coke's investment in Bodyarmor as being at a "premium." In other portions of the FAC, however, ABC continued to describe the valuation as a "premium."[38]

ABC also alleged that Repole placed a "unique" value on cash that drove him to pursue the Coke Deal to the detriment of Bodyarmor and its stakeholders.[39] In support of its newfound theory, ABC quoted a text message from Repole to Mr. Collins, which stated, in part: "JAB was not interested in acquiring the company unless my management and I placed ALL our money back into the company."[40]

### iii. SAC

On June 16, 2020, ABC filed the SAC, which added a tortious interference claim against Coke and simultaneously revised some of the allegations underlying ABC's tortious interference claim against Repole and its promissory estoppel claim

---

[37] Defs.' Mot., Ex. 3.
[38] FAC ¶ 15.
[39] *See, e.g., id.,* ¶ 16 ("Repole placed a unique value on securing a deal that summer and receiving a prompt cash payment . . ."); *id.* (Mr. Repole "allowed his personal desire for that deal and payout to cloud and compromise his "judgment . . .").
[40] *Id.* ¶ 60.

against Bodyarmor.[41] Repole and Bodyarmor then moved to dismiss the promissory estoppel and tortious interference claims against them (the "Motion"), arguing the amendments to the allegations were substantive changes, and that ABC removed the focus from Bodyarmor and Repole in order to shift the blame to Coke. The SAC repeated the allegation in the Original Complaint that Repole obtained a "premium valuation" for Bodyarmor, specifically that the valuation was "about ten times" the amount at which ABC itself valued Bodyarmor.[42]

Moving Defendants maintain that the tortious interference claim against Repole must be dismissed because ABC does not allege in the SAC that Repole acted outside the scope of his authority or received any benefits different from those received by any other Bodyarmor investor, including ABC. With respect to the promissory estoppel claim, Moving Defendants argue that ABC "walks back" its narrative that Repole approved the KDP transaction. In place of its allegations in the Original Complaint that Repole "consented to" or "approv[ed]" of the KDP transaction, ABC now avers that Repole's communications showed he "thought well of the [KDP transaction]" and "endorsed" the merger.[43]

---

[41] Defs.' Mot., Ex. 4.

[42] SAC, ¶ 76; *see also id.* ¶¶ 77, 91, 93.

[43] *Id.* ¶¶ 10, 96, 98.

## PARTIES' CONTENTIONS

Moving Defendants argue the Court should dismiss Count III of the SAC (tortious interference) for failure to state a claim. Repole offers three reasons that the SAC fails to plead a tortious interference claim against him. First, he contends ABC's allegation that he placed a unique value on cash merely is conclusory, and ABC has failed to make any specific factual allegations about his supposed personal interest even though document discovery substantially was complete before ABC filed the SAC.[44] Second, Repole argues ABC misleadingly quotes an excerpt from a text message in an effort to bolster its claim that he was focused on generating a cash payment for himself and management at the expense of Bodyarmor and its stockholders. The full text message, Repole asserts, expressly states he was focused on the best outcome for Bodyarmor and its stockholders and "eviscerates" any inference that he was acting in bad faith or outside the scope of his authority.[45] Third, Repole maintains that ABC's allegation in the SAC that the Coke Deal was based on a premium valuation defeats ABC's conclusory and unsupported allegation that Repole could have obtained a better deal. Repole contends these allegations are not enough to overcome Delaware's business judgment rule or to state a claim that he

---

[44] Defs.' Mot. at 3.
[45] Id. at 4.

12

was acting in bad faith to advance his personal interests ahead of Bodyarmor and its stockholders.[46]

ABC responds that its claim against Repole for tortious interference specifically alleges facts concerning the deal's timing, terms, and partner that surpass Delaware's notice-pleading requirements.[47] ABC focuses its tortious interference claim on the allegedly problematic aspects of the Coke Deal, including the indemnity provisions, conflict of interest, and Repole's singular focus on obtaining an up-front cash payment.[48] ABC further contends that, to the extent Repole's text messages create competing inferences, it is inappropriate to resolve such inferences on a motion to dismiss.[49]

Moving Defendants also argue the Court should dismiss ABC's promissory estoppel claim. Although the Court previously held this claim adequately was pleaded, Moving Defendants argue ABC materially changed (and weakened) the allegations in the SAC. Specifically, while the Original Complaint described Repole as "approving" and "consent[ing] to" the KDP transaction, the SAC now avers that Repole "endorsed" and "thought well" of the merger and that he approved of it "by all indications."[50] Moving Defendants contend these are material changes, and the

---

[46] *Id.*
[47] Pl.'s Resp. at 3.
[48] *Id.* at 13-14.
[49] *Id.* at 20.
[50] Defs.' Mot. at 5-6.

new language does not plead an unambiguous promise, so the SAC no longer states a claim for promissory estoppel.[51]

ABC disagrees, arguing its changes to the SAC were not material and that it states a claim against Bodyarmor for promissory estoppel. ABC asserts this Court's previous holding denying the motion to dismiss this claim in the Original Complaint is the law of the case, and Bodyarmor cannot make the showing required for reconsideration.[52] Even if Bodyarmor could seek dismissal again, ABC contends the SAC substantially is the same as the Original Complaint, which this Court held stated a claim for promissory estoppel.[53]

## STANDARD OF REVIEW

A claim must be dismissed under Superior Court Civil Rule 12(b)(6) if the complaint fails "to state a claim upon which relief can be granted."[54] Under this standard, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[55] The Court, however, must "ignore

---

[51] *Id.*
[52] Pl.'s Resp. at 23-26.
[53] *Id.* at 26.
[54] Del. Super. Ct. Civ. R. 12(b)(6).
[55] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 535 (Del. 2011); *Doe v. Cedar Academy*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

conclusory allegations that lack specific supporting factual allegations."[56] Moving Defendants implicitly suggest the Court should hold ABC to a more stringent standard because it has conducted significant discovery and has not offered more detail in support of its allegations. The Rule 12(b)(6) standard, however, does not change merely because discovery has been conducted; the notice pleading standard continues to apply to ABC's claims.[57]

## ANALYSIS

### A. ABC fails to state a claim for tortious interference.

To state a claim for tortious interference with contract, a plaintiff must allege that the defendant "intentionally and improperly interfere[d] with the performance of a contract" between the plaintiff "and a third person by inducing or otherwise causing the third person not to perform the contract."[58] An officer of a Delaware limited liability company cannot be held liable for tortiously interfering with his own company's contract unless he "acted beyond the scope of [his] agency."[59] Acts

---

[56] *Rammuno v. Crawley*, 705 A.2d 1029, 1034 (Del. 1998).

[57] *See, e.g.*, *OptimisCorp v. Waite*, 2015 WL 357675, at *2 (analyzing a motion to amend with reference to the notice pleading standard even though fact discovery already was completed).

[58] *Smith v. Hercules, Inc.*, 2002 WL 499817, at *2 (Del. Super. March 28, 2002) (citing RESTATEMENT (SECOND) OF TORTS § 766 (1977)).

[59] *Grand Ventures, Inc. v. Paoli's Rest., Inc.*, 1996 WL 30022, at *4-5 (Del. Super. Jan. 4, 1996) (dismissing tortious interference claims against individual owners of restaurant because plaintiff failed to allege that owners acted outside the scope of their authority); *see also Wallace ex. rel Cencom Cable Income P's II, Inc., L.P. v. Wood*, 752 A.2d 1175, 1183 (Del. Ch. 1999) (dismissing tortious interference claim against partnership officers for failure to state a claim because plaintiff did not sufficiently allege that they "exceeded the scope of their authority" to act on behalf of partnership).

15

carried out for an employee's personal motives—rather than for the employer's benefit—are outside the scope of employment and can amount to interference with a contract.[60]

Delaware law presumes that a corporate officer's actions that cause the corporation to breach a contract were taken for the corporation's benefit.[61] Accordingly, in order to state a claim for tortious interference against a corporate officer, a plaintiff must plead adequately that the officer (1) "was not pursuing legitimate profit-seeking activities of the affiliated enterprise in good faith," or (2) "was motivated by some malicious or other bad faith purpose to injure the plaintiff."[62] This legal rule derives from the business judgment rule's presumption that officers and directors act loyally and in good faith when making business decisions in their fiduciary capacity.[63]

ABC has not alleged any facts supporting a reasonable inference that Repole acted beyond the scope of his authority while negotiating the Coke Deal. First, the tortious interference claim is deficient because several of ABC's allegations are conclusory. For instance, ABC points to the alleged conflict Bodyarmor had with

---

[60] *See, e.g., Nye v. Univ. of Del.*, 2003 WL 22176412, at *7 (Del. Super. Sept. 17, 2003).

[61] *Pennington v. Scioli*, 2011 WL 3568266, at *2 (Del. Super. Feb. 16, 2011).

[62] *Yu v. GSM Nation, LLC*, 2018 WL 2272708, at *15-16 (Del. Super. April 24, 2018) (dismissing tortious interference claim against CEO because complaint "fail[ed] to allege the requisite level of bad faith or malice needed.").

[63] *Hercules*, 2002 WL 499817, at *3 (plaintiffs would have to prove that CEO's actions in causing his company to terminate contract "were not motivated by, and for, his corporate responsibilities, but were instead principally executed to further his personal investments").

16

Coke due to its ownership of Powerade. ABC also alleges Repole acted purely out of self-interest because he focused on getting Bodyarmor's management, including himself, an up-front cash payment. ABC does not, however, allege any further facts to connect Coke's ownership of Powerade and the cash payment to any bad faith or self-interested motive Repole allegedly had. These allegations are no more specific than the allegation in the Original Complaint that "Mr. Repole profited hugely as a result of his wrongful and malicious termination of the Agreement"—an allegation this Court held was insufficient to state a claim for promissory estoppel.[64] These allegations, standing alone, do not permit an inference Repole acted out of his own interests and not pursuant to a profit-seeking motive. More importantly, these conclusory allegations are insufficient to overcome the fundamental presumption that Repole was acting to benefit Bodyarmor and its stockholders.

ABC's claim stands in marked contrast to the few tortious interference claims against corporate officers that have advanced beyond the pleadings stage. Tortious interference claims rarely are pleaded adequately against corporate officials, but those cases that have survived a motion to dismiss contained substantive factual allegations regarding the corporate official's personal motivations. For example, in *Nye v. University of Delaware*, the University Provost acted to ensure the College of

---

[64] Original Compl. ¶ 56.

17

Agriculture's Dean would not have his employment with the school renewed.[65] The plaintiff alleged defendants directly involved themselves in the Dean's employment review and took steps to interfere with the Dean's employment contract due to animosity and a personal vendetta against him.[66] The court found these allegations sufficient to state a claim that the defendants were acting outside the scope of their employment.[67] Unlike the plaintiff in *Nye*, ABC makes no allegations regarding Repole's personal motives beyond its conclusory allegations about the cash payment. Without more specific, conceivable allegations of Repole's self-interest, ABC cannot overcome the presumption that Repole acted for Bodyarmor's benefit.

Second, ABC's allegations regarding the flaws in the Coke Deal improperly seek to undermine Repole's business judgment and the presumptions required by Delaware's business judgment rule. The SAC's tortious interference claim focuses on the premium valuation Bodyarmor received in the Coke Deal, alleging Bodyarmor accepted a short-term inflated valuation in exchange for detrimental indemnity provisions that expose Bodyarmor to "enormous liability" in the long run. ABC also alleges Bodyarmor would have been better off remaining with ABC where

---

[65] *Nye*, 2003 WL 22176412, at *1.
[66] *Id.* at *1-2.
[67] *Id.* at *7; *see also Skye Mineral Investors, LLC v. DXS Capital (U.S.) Limited*, 2020 WL 881544, at *32-34 (Del. Ch. Feb. 24, 2020) (finding plaintiffs pleaded facts sufficient to support a tortious interference claim by alleging defendants schemed to drive a corporate subsidiary into bankruptcy so they could purchase it at an extremely low price).

18

it could have continued to grow without subjecting itself to liability.[68] Those arguments, however, do nothing more than second-guess prototypical business decisions. Delaware law eschews that type of "Monday Morning quarterbacking," and Plaintiff's attempt to end-run the business judgment rule by bringing a tortious interference claim instead of a fiduciary duty claim contradicts the policy that officers' "freedom of action directed toward corporate purposes should not be curtailed by fear of personal liability."[69] The only relevant inquiry is whether Repole had a legitimate profit-seeking motive, not whether the Coke Deal actually benefitted Bodyarmor in hindsight.[70] And, as discussed in the preceding paragraph, ABC's allegations that Repole was pursuing his own self-interest, rather than legitimate profit-seeking, are too conclusory for the tortious interference claim to survive dismissal.

Finally, to prove Repole acted outside the scope of his authority, ABC seizes upon a text message from June 1, 2018 in which Repole expressed reservations about pursuing a deal with JAB. ABC alleges Repole's self-interest is evident from his statement that, "[JAB is] not interested in acquiring the company unless my

---

[68] SAC ¶ 18.

[69] *Young v. West Coast Indus. Relations Assoc., Inc.*, 763 F.Supp. 64, 77 (D.Del. 1991) (quoting *Steranko v. Inforex, Inc.*, 362 N.E.2d 222, 235 (Mass. App. Ct. 1977)). Apologies for the protracted football analogy, which hopefully was less painful than the Philadelphia Eagles' recent season.

[70] *Pennington*, 2011 WL 3568266, at *3 ("[A]ll that matters is whether Defendant acted with the purpose or intent of benefitting the corporation. It does not matter whether, in hindsight, the decision actually benefitted the corporation").

management and I placed ALL our money back into the company." In context, however, Repole's text message does not support an inference that he was not acting in Bodyarmor's interests when pursuing the Coke Deal. The Court may consider the entirety of this text message because it is incorporated by reference into the SAC.[71] The relevant portion of the text message says:

> They [JAB] have been crystal clear the brand and my team are low on [their] priority list. We are focused on over delivering our sales numbers in the Dpsg system now. We are focused on the best outcome for my shareholders . . . . JAB is focused on JAB. I am focused on Bodyarmor's future. JAB came in was crystal clear they are not interested in acquiring the company unless my management and I placed ALL our money back into the company.[72]

Considered in its entirety, the text message ABC cites does not support an inference that Repole was acting in bad faith or to advance his personal interests.

ABC contends dismissal of the tortious interference claim is premature because such claims rarely are amenable to resolution at such an early stage of litigation. But, a tortious interference claim appropriately can be dismissed at the pleadings stage where the allegations supporting the claim merely are conclusory. The SAC is "devoid of any factual allegations that lead to a reasonable inference" that Repole acted outside the scope of his authority.[73] Accordingly, the Court need

---

[71] *Hignutt v. Kencrest Services Inc.*, 2015 WL 7776651, at *1 (Del. Super. Dec. 1, 2015).
[72] Defs.' Mot., Ex. 5.
[73] *Kuroda v. SPJS Holdings, LLC, et al.*, 971 A.2d 872, 885-86 (Del. Ch. 2009) (dismissing plaintiff's tortious interference claim).

not wait for further development of the factual record to rule on ABC's tortious interference claim. For the reasons discussed above, the SAC fails to state a claim for tortious interference and dismissal with prejudice is warranted.[74]

### B. The SAC continues to state a claim for promissory estoppel.

ABC's claim for promissory estoppel did not change materially between the Original Complaint and the SAC, and that claim continues to be pleaded adequately. To state a claim for promissory estoppel, a plaintiff must plead both that (i) the defendant made an unambiguous promise to the plaintiff and (ii) the plaintiff reasonably relied on that promise to its detriment.[75] A generalized expression of enthusiasm does not amount to the requisite unambiguous promise; rather, the alleged promise must be "definite and certain."[76] Any statement that is "vague, not clear and definite, and would not cause a reasonable [promisee] to believe that an offer had been made" will not qualify as an unambiguous promise.[77]

The Court's holding that the Original Complaint stated a claim is law of the case.[78] Accordingly, if the pleading has not changed substantively, that decision is

---

[74] Unlike the promissory estoppel claim, this Court never ruled the tortious interference claim in either the Original Complaint or the FAC adequately was pleaded. ABC has now had three opportunities to plead this claim and has had the benefit of substantial document discovery from Repole and the other defendants. At this stage, dismissal without leave to amend is appropriate. *See Mooney v. E.I. DuPont de Nemours and Co.*, 2018 WL 3861371, at *1 (Del. Aug. 13, 2018).

[75] *See Windsor I, LLC v. CWCapital Asset Mgmt. LLC*, 2019 WL 4733430, at *11 (Del. Super. Sept. 27, 2019).

[76] *Cont'l Ins. Co. v. Rutledge & Co., Inc.*, 750 A.2d 1219, 1233 (Del. Ch. 2000).

[77] *Tolmine v. United Parcel Serv., Inc.*, 930 F.2d 579, 581-82 (7th Cir. 1991).

[78] *Fanean v. Rite Aid Corp. of Delaware, Inc.*, 984 A.2d 812, 818 (Del. Super. 2009).

not one the Court will or should revisit.[79] The main issue for the Court to resolve is whether changing the words that described Bodyarmor's promises from the term "approved" to the purportedly weaker term "endorsed" was a material change. In its bench ruling refusing to dismiss the promissory estoppel claim in the Original Complaint, the Court concluded that "the Complaint adequately pleads both the existence of an unambiguous promise and the existence of detrimental reliance."[80] And, in granting leave to amend the tortious interference claim in that same complaint, the Court made clear it would not entertain further challenges to the promissory estoppel claim, stating: if "the defendants want to file a motion to dismiss that amended complaint, to be clear only on Count III, only on the tortious interference claim, they can do so within the time allotted by the Court's rules."[81]

Moving Defendants argue the changes in the SAC are significant because the allegations as amended do not plead the existence of an unambiguous promise. ABC, on the other hand, contends that the terms "endorse" and "approve" are interchangeable, citing Merriam-Webster's Dictionary where "approved" and "endorsed" are synonyms.[82] ABC explains that, if anything, endorsement is the stronger term because it connotes enthusiasm and an active embrace. It is true,

___

[79] *Frank G.W. v. Carol M.W.*, 457 A.2d 715, 718-19 (Del. 1983).
[80] 9/13/2019 Hg'r Tr. at 89:22-90:2.
[81] *Id.* at 93:10-14 (emphasis added).
[82] *See* Endorse, Miriam-Webster Dictionary (1997).

however, that the terms "approve" and "endorse" are not interchangeable in every legal context. For instance, in *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, the Court of Chancery analyzed an indenture agreement's continuing-directors provision to determine whether the board's approval of the slate of nominees also constituted its endorsement of those nominees.[83] The Court held that the term "approve" was not synonymous with the terms "endorse" or "recommend." The Court noted *Black's Law Dictionary*'s definition of "to approve" meant "to give formal sanction to; to confirm authoritatively."[84] This definition, the Court reasoned, contemplated at least two parties working together and suggested that the approving party had a right akin to a veto. The Court found that "while endorsement or recommendation may necessarily imply approval, the reverse is not true."[85] Therefore, the Court concluded that the board's approval did not necessarily mean it also endorsed the slate of nominees.

In its Response, ABC does not clearly explain why it changed the term "approve" to "endorse." ABC, however, states that it only meant for this to be a semantic change, and that the word "endorse" still is meant to support its contention that Repole indicated to ABC that he would approve ABC's distribution and the

---

[83] *San Antonio Fire & Police Pension Fund v. Amylin Pharm., Inc.*, 983 A.2d 304, 314 (Del. Ch. 2009), *aff'd*, 981 A.2d 1173 (Del. 2009).
[84] *Id.* (citing *Approval*, Black's Law Dictionary (8th ed. 2004)).
[85] *Id.*

KDP transaction. And, the SAC still uses the word "approve," including in ABC's allegation that "by all indications, Repole approved of ABC's distribution and of the KDP transaction."[86] Moreover, the competing inferences that can be drawn from the text messages cannot be resolved in a pleadings-based motion.[87] Whether Repole's alleged "endorsement" actually amounts to an unambiguous promise, as opposed to a generalized expression of enthusiasm, is a factual issue. In sum, the changes to the SAC are non-substantive and semantic; the Court already has ruled that very similar allegations were sufficient to state a claim.

ABC also adequately alleges detrimental reliance in three ways. ABC first alleges that, had Repole not conveyed positive feelings toward the deal, ABC would have worked to formally seek Bodyarmor's approval. Second, ABC contends it did not look for other suppliers because it believed Bodyarmor supported the deal. Finally, ABC avers it would have changed materially how it proceeded to closing if it was aware of Bodyarmor's position. These allegations are more than conclusory and are identical to the allegations that survived dismissal of the Original Complaint. Given the stage of the proceedings, ABC has sufficiently pleaded reliance. Accordingly, ABC's promissory estoppel claim cannot be dismissed at this time.

---

[86] SAC ¶ 98.
[87] *See In re Dell Tech., Inc. Class V S'holders Litig.*, 2020 WL 3096748, at *14 ("[I]f a document supports more than one possible inference, and if the inference that the plaintiff seeks is reasonable, then the plaintiff receives the inference.")

24

## CONCLUSION

For the reasons set for herein, Defendants' Partial Motion to Dismiss the Second Amended Complaint is **GRANTED** as to Count III (tortious interference) and **DENIED** as to Count II (promissory estoppel).

**IT IS SO ORDERED.**